IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>ROBERTO ACOSTA,<br><br>    Defendant.<br>_____/ | No. C 11-00182 CRB<br><br>**MEMORANDUM AND ORDER GRANTING MOTION FOR A NEW TRIAL** |

Defendant Robert Acosta moves for an acquittal under Federal Rule of Criminal Procedure 29 or for a new trial under Federal Rule of Criminal Procedure 33, following his July 2011 conviction by a jury on one count of making a false statement in violation of 18 U.S.C. § 1001. See generally Mot. (dkt. 58). As explained below, the Court concludes that Acosta's delay in filing his motion is due to excusable neglect. See Fed. R. Crim. P. 45(b)(1)(B). The Court further finds that, although Acosta has not met his burden under Rule 29, he has met his burden under Rule 33, both because the government failed to prove the materiality of Acosta's false statement, and because Acosta might have been convicted on an uncharged false statement. Therefore a new trial is warranted.

//

//

//

## I. BACKGROUND

### A. Acosta's Role in MS-13 and as an Informant

Acosta, a Honduran national, was a member of the transnational gang La Mara Salvatrucha, or MS-13. See Gov. Trial Memo. (dkt. 32) at 1-2. He began working as an undercover informant for Immigration and Customs Enforcement ("ICE") in the United States beginning in 2005, having fled Honduras to escape a death threat from MS-13. Def. Sentencing Memo (dkt. 51) at 5; RT (7/11/11) 5 ("By July 2005, the defendant was officially approved to act as an informant.").

As an informant, Acosta gave ICE "valuable information about guns on the street; [and] crimes that were about to occur," and "he made hundreds of hours of recordings of these MS-13 members committing crimes." RT (7/11/11) 5, 69. Acosta generated "incredibly good information from the streets about [MS-13]. He was providing great information about homicides that had occurred on the streets; about future planned homicides that they were discussing." Id. 85. Aside from one interruption, he worked as an undercover informant from July 2005 through October 2008, when 40 members of MS-13 were arrested in San Francisco. Id. 23, 55, 69, 131. The information Acosta provided to the government contributed greatly to those arrests. Id. 55.

During his work as an informant, Acosta disclosed to the government numerous unlawful acts he had committed in Honduras, including kidnapping, attempted murder, carrying a homemade gun, searching for rival gang members while possessing guns, robbing, stealing, and smuggling grenades. Id. 75-80. But the government did not ask Acosta initially whether he participated in any murders or other violent crimes in Honduras. See id. 78.

It was not until May 7, 2008 that the government asked Acosta directly whether he had ever participated in a murder; he said that he had not. Id. 80.[1] On December 12, 2008, ICE agents and a federal prosecutor met again with Acosta to discuss his criminal history.

---

[1] Asked whether he believed that Acosta lied in May 2008, ICE Special Agent Moore testified that he "thought there was significant misunderstanding about the way the question was asked; that – as far as what it meant to kill someone, and what it means to legally be responsible for someone's death." Id. 166.

2

1  Id. 84-85. Acosta was asked whether he had ever killed anyone; he said no. Id. 87. He was
2  then asked, under a broader definition of murder, whether he had ever passed along orders to
3  kill someone, or planned or conspired to have someone killed. Id. In response, Acosta told
4  the government about an incident in Honduras in which he passed along orders to have three
5  bus drivers murdered. Id. 88. He did not provide information about any additional murders.
6  Id. In June 2009, Acosta was interviewed again and provided more detail about the murders
7  of the three bus drivers. Id. 92.

On February 2, 2011, a federal prosecutor and ICE interviewed Acosta in preparation for the March 2011 trial of the MS-13 members ("the MS-13 trial") Acosta's information had helped to arrest; Acosta was to be a witness. Id. 94-95. They asked Acosta again about his criminal history, and, for the first time, Acosta revealed that he had participated in eight additional murders in Honduras. See id. 101-107. Acosta was visibly upset when describing these murders. Id. Agent Moore's first thought was to "build [Acosta] back up," and he told Acosta "this doesn't necessarily need to end" and "[e]verything you've done in the last four years doesn't necessarily have to go away." Id. 107. Acosta maintained that he had never lied to ICE Special Agent Merendino, that he told Merendino that he was a leader and that Merendino should have known what that meant but had never asked. Id. 110. The government was never able to confirm any information about the murders. Id. 112.

Acosta was arrested on February 4, 2011. Id. 139.

**B.     The Indictment**

A single-count indictment was returned on March 29, 2011. See Indictment (dkt. 10) at 1. The indictment charged Acosta with violation of 18 U.S.C. § 1001, making a materially false statement in a matter within the jurisdiction of the executive branch of the United States Government. Id. The Grand Jury charged:

> In or about December 2008 . . . the defendant . . . unlawfully, knowingly, in a manner within the jurisdiction of the executive branch of the Government of the United States, did make a materially false, fictitious, and fraudulent statement and representation, to wit, during a debriefing <u>with federal prosecutors and a Special Agent with [ICE]</u>, ACOSTA falsely denied being involved in any murders or attempted murders aside from one incident involving bus drivers in Hondurus, when in fact, he was directly involved in approximately eight additional murders in Honduras.

3

Id. (emphasis added).

### C. The Trial

#### i. The Government's Pretrial Brief

In its pretrial brief, the government summarized the evidence against Acosta, stating that on "various occasions, including on December 2008," Acosta was asked about his criminal history. Gov. Pretrial Br. (dkt. 32) at 2. The government explained that "Acosta's failure to disclose his participation in the eight murders, despite repeated questions about the same, form the basis of the charge against him." Id. at 2. The government recognized that the false statement had to be materially false, and framed the issue as whether "the statement was material to the activities or decisions of Immigration and Customs Enforcement." Id. at 1-2.

#### ii. The Government's Opening Argument and the Testimony by Government Witnesses

The jury was selected on July 7, 2011, and trial began on July 11, 2011. See generally RT (7/7/11) and RT (7/11/11).

In the government's opening argument, it referenced Acosta's May 2008 false statement (denying any murders) and his December 2008 false statement (denying any murders beyond the bus drivers). See RT (7/11/11) 7. The government also referenced two theories of materiality: the materiality of the false statements to prosecutors and also to ICE. Id. 4 ("a material false statement – to ICE agents and to federal prosecutors . . . a false statement that affected how they handled their work").

The government called three witnesses: Agents Moore and Merendino, and Honduran National Police Officer Roberto Michel Bejarano-Galo.[2] See generally Trial Log (dkt. 45).

Agent Merendino testified that he researched Acosta's criminal history because "[i]f he had an extensive criminal history in either the U.S. or in his country of origin, we would

---

[2] This last witness testified very briefly, explaining that he could not verify Acosta's criminal history in Honduras. See id. 180-84.

4

likely opt to not utilize him as a source, due to liability concerns." RT 21. He further testified:

> Q: And how would it have made a difference in whether or not he could act as an informant for ICE?
> A: He definitely would not have acted as an informant for ICE if we had knowledge that he committed eight homicides.
> Q: What would be the concern?
> A: General liability concern of . . . for the Government and the public safety here in the United States.

Id. 57-58.

Agent Moore testified that knowing Acosta's criminal history was "important to know him as a witness, and his credibility and his integrity," and added that it was important to know who Acosta was "if you have him working out on the streets with dangerous individuals, possibly around guns, knives, that kind of thing." Id. 81. Moore asserted that Acosta's revelations in February 2011 were "extremely important, significant events that [he] felt changed a lot of things about the investigation, and where this investigation would go." Id. 113. He further testified that, following the revelations,

> the investigation was significantly damaged, in the sense that I didn't know who I was talking to. You know everything had changed surrounding the details of what he had told us in his criminal history. And it goes to his integrity. It goes to his believability on the stand. So from our – at this point, we're – there not really an active criminal investigation. It's a trial prep process.

Id. 168-69. But Moore made it clear that it was not his job to decide whether Acosta would testify in the MS-13 trial. See id. 172; id. 140 ("That's not my job, to decide any of those – those – [issues about whether Acosta would testify]."); id. 144 ("I'm not one of the attorneys deciding on who to call or not call to the stand, as far as strategy, you know."). The Court ruled that because Moore lacked foundation to testify about whether Acosta was called as a witness, the prosecutor could not elicit that information from him. Id. 161-62.

The testimony was instead that after Acosta's arrest, there was continued discussion about whether Acosta would be used as a witness in the MS-13 trial, and whether there was "some sort of a charge that would allow him to testify." See id. at 141-45. There was no

testimony from the government prosecutors that Acosta did not testify in the MS-13 trial, and no other evidence that Acosta did not testify in that trial.[3]

### iii. The Government's Closing Arguments

Two features of the government's closing argument are relevant to Acosta's present motion. First, the argument referenced Acosta making false statements on multiple occasions, and second, it referenced the materiality of those false statements to both the federal prosecutors and to ICE.

As to the number of false statements at issue, the prosecutor argued:

> The problem that the defendant faced in telling these lies is he had to tell it over and over and over. He had to tell it to different people. He had to tell it in different contexts at different times. . . . And you heard from Special Agent Moore that the defendant lied repeatedly, until February of this year, when he couldn't hold on to that lie any longer, and he dropped the bombshell in that meeting on February 2.

RT (7/12/11) 14-15. She further argued: "It became clear in February of this year that the defendant lied in May 2008; then he lied in December 2008 about whether or not he personally killed anyone." Id. 18. And she argued: "He lied in May 2008 . . . he lied on December 2008." Id. 24.

As to the materiality of those false statements, the prosecutor argued that they were "capable of affecting how agents and prosecutors would do their work." Id. 9. She asserted that the false statements were material because "ICE wouldn't have signed him up as an informant if they knew that he was an eight-time murderer." Id. 25. The false statements were also material, the prosecutor argued, because "the fact that there was now a meeting to discuss how the defendant's revelations about his murders had to be addressed proves that the lie the defendant told over and over again . . . was, of course, capable of affecting how the agents and prosecutors did their work." Id. 26.

//

---

[3] The government sought to admit an order from Judge Alsup, who was presiding over the MS-13 trial, stating that Acosta would not be testifying in that trial, and that the witnesses the government had put forth to authenticate certain of Acosta's recordings were insufficient. Id. 157-158. This Court sustained Acosta's objection to such evidence, citing a lack of foundation, hearsay, and the confusion caused to the jury by having a trial within a trial about why certain evidence was not admitted in the MS-13 trial. See id. 161-62.

6

#### iv. Jury Instructions

Despite having heard argument about the false statements' materiality to both ICE and to federal prosecutors, the jury was instructed only as to the ICE theory of materiality. The relevant instruction provided:

> The defendant is charged with knowingly and willfully making a false statement in a matter within the jurisdiction of a government agency in violation of 1001 Title 18 of the United States Code.
>
> For the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt.
>
> First, the defendant made a false statement in a matter within the jurisdiction of Immigration and Custom Enforcement.
>
> Second, the defendant acted willfully, that is deliberately and with knowledge that the statement was untrue; and
>
> Third, the statement was <u>material to the activities or decisions of Immigration and Custom Enforcement</u>.
>
> A statement is material if it had natural tendency to influence, or was capable of influencing <u>the agency's decision or activities</u>.

Id. 8; dkt. 39 (Jury Instructions) at 14-15 (emphasis added).

#### v. Verdict

On July 12, 2011, the jury found Acosta guilty of making a false statement in violation of 18 U.S.C. § 1001. RT (7/12/11) 45-47. It is this verdict that Acosta seeks to set aside with his current motion.

## II. LEGAL STANDARD

### A. Rule 29 Acquittal Standard

Federal Rule of Criminal Procedure 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Evidence is insufficient to sustain a conviction if, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324 (1979); United States v. Nevils, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (en banc).

## B. Rule 33 New Trial Standard

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A district court's power under Rule 33 is much broader than under Rule 29. United States v. Kellington, 217 F.3d 1084, 1097 (9th Cir. 2000). Unlike with Rule 29, "[t]he court is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses." Id. If, "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred," the court may set aside the verdict and grant a new trial. Id. (citing United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980)).

## III. DISCUSSION

### A. Timeliness of Acosta's Motion

Before reaching the merits of Acosta's motion, the Court must address the government's argument that the motion is untimely. See Opp'n (dkt. 60) at 9-12.

Motions under Rule 29 and under Rule 33 must both be made within 14 days of a verdict. Fed. R. Crim. P. 29(c)(1); Fed. R. Crim. P. 33(b)(2). Acosta's verdict was entered on July 12, 2011 and he did not file his motion until November 14, 2011. See generally RT (7/12/11) 45-47; Mot. However, Rule 45 provides that a court may extend the time for filing such motions if the defendant "failed to act because of excusable neglect." Fed. R. Crim. P. 45(b)(1)(B). Ineffective assistance of counsel can constitute the excusable neglect necessary to support an extension of time. See United States v. Munoz, 605 F.3d 359, 367-72 (6th Cir. 2010).[4]

---

[4] The factors of Pioneer Investment Services Co. v. Brunswick Assoc., 507 U.S. 380, 395 (1993) must also be met. See United States v. Jassal, 388 Fed. Appx 748, 750 (9th Cir. 2010) (holding that the district court properly applied the Pioneer factors to a Rule 33 motion). The Court finds that they are met here: there is a great danger of prejudice to Acosta in finding his motion time-barred, the delay of several months between when the motion should have been filed and was filed (by new counsel) will not have a negative impact on judicial proceedings, the reason for Acosta's delay is his trial counsel's ineffective assistance, it was not within Acosta's control to bring such a motion on his own, and there has been no showing that he acted in bad faith. Pioneer Investment Svcs. Co., 507 U.S. at 395.

8

To demonstrate ineffective assistance, Acosta must demonstrate both that his trial counsel's failure to move for a judgment of acquittal under Rule 29 and for a new trial under Rule 33 was objectively unreasonable and prejudiced Acosta. See Strickland v. Washington, 466 U.S. 668, 687 (1984). The government concedes that if the motion is meritorious, then Acosta would have been prejudiced by his trial counsel's failure to have brought it. See Tr. (12/14/11) 7. Therefore, the only question to resolve on timeliness is whether Acosta's trial counsel was objectively unreasonable in not filing the motion.

The government argues that Acosta's trial counsel reasonably could have (1) concluded that the motion would be futile, because it already knew the Court's view on materiality, or (2) chosen not to bring such a motion for strategic purposes, because it would have delayed sentencing. Opp'n at 9-12. The Court rejects both arguments.

First, it is simply not plausible that making such motions would have delayed sentencing. Sentencing was initially set for October 19, 2011. Id. at 11. A timely motion, filed within 14 days of the July 12, 2011 verdict, would have presented no delay to sentencing, and the Court would not have permitted it to do so.

Second, although the government is correct that the Court engaged in discussion with counsel outside of the presence of the jury on the issue of materiality, see id. at 6, the government is incorrect in asserting that "this Court made clear that it believed that the government had introduced sufficient evidence to show materiality," id. at 10. The Court expressed a variety of opinions as to the strength of the government's case, which included stating, "I don't even know [whether] you have any testimony in the record, really, that goes to, quote, the 'materiality' of the statements," RT (7/11/11) 151, and voicing skepticism about the idea that the government would not call a murderer as a witness, or use one as an informant, because "we don't find our informants in churches," id. The Court endeavored to articulate the government's theory of materiality in order to help it understand the government's case, see Opp'n at 6-7, but it never ruled that the government had proven that element.

9

For Acosta's trial counsel not to bring a Rule 29 or Rule 33 motion due to the Court's various comments would have been objectively unreasonable. Even if the Court "had already expressly made clear that it thought that the government had proved materiality," see Opp'n at 11, which it did not, Acosta's trial counsel should nevertheless have brought the motion to preserve the issue for appeal. See United States v. Reyes, 510 F. Supp. 150, 153 (D. Ariz. 1981) ("The object of a motion for a new trial is both to give the trial court the chance to correct errors in the proceedings if any, and to preserve such errors for appeal."). This is particularly so when it would have taken about 20 seconds to make an oral motion. The government conceded at the motion hearing that one factor the Court could take into account in assessing whether it was reasonable not to bring such a motion is how much time and effort would be involved in bringing the motion. Tr. (12/14/11) 8-9. Although it is not always ineffective assistance to fail to file such a motion, see, e.g., James v. Borg, 24 F.3d 20, 27 (9th Cir. 1994) (failure to bring a futile motion not ineffective assistance), it was here, particularly in light of the obvious flaws in the government's case, discussed below. The failure to bring the motion was therefore objectively unreasonable.

Accordingly, the Court finds that Acosta's delay in filing his motion was due to excusable neglect under Rule 45. Having concluded that the motion is timely, the Court now turns to its merits.

### B. The Federal Prosecutor Theory of Materiality

The first argument Acosta makes in his motion is that the evidence was not sufficient to support a conviction on the theory that his false statement was material to the federal prosecutors preparing the MS-13 trial. The Court agrees.

The federal prosecutor theory of materiality was not part of the government's trial brief; it addressed only the ICE theory of materiality. See Gov. Trial Br. at 1-2 ("The elements of the offense are as follows: (1) the defendant made a false statement in a matter within the jurisdiction of Immigration and Customs Enforcement, ('ICE') . . . and (3) the statement was material to the activities or decisions of Immigration and Customs Enforcement.").

10

Consistent with the trial brief, the evidence that came in at trial also did not support such a theory. Although Agent Moore testified that knowing Acosta's criminal history was "important to know him as a witness, and his credibility and his integrity," RT 81, and that Acosta's false statement went "to his believability on the stand" and affected the "trial prep process," id. 168-69, Moore conceded that it was not his job to decide whether Acosta would testify in the MS-13 trial, see id. 172; id. 140 ("That's not my job, to decide any of those – those – [issues about whether Acosta would testify]."); id. 144 ("I'm not one of the attorneys deciding on who to call or not call to the stand, as far as strategy, you know."). And no one whose job it was to make that decision did testify: no federal prosecutor took the stand. Mot. at 13. The jury did not even hear that Acosta did not testify in the MS-13 trial. See RT 161-62 (Court sustaining objection to such testimony based on lack of foundation, hearsay, and the confusion caused to the jury).

The government points to the prosecutor's closing argument that "the fact that there was now a meeting to discuss how the defendant's revelations about his murders had to be addressed proves that the false statement . . . was, of course, capable of affecting how the . . . prosecutors did their work." Opp'n at 14 (citing RT 26).[5] It is true, as the government argues, that to prove that the false statement was material to the prosecutors in the MS-13 case, the government need only show that it had "a natural tendency to influence, or was capable of influencing," the prosecutors. See Kungys v. United States, 485 U.S. 759, 770 (1988); see also United States v. Somsamouth, 352 F.3d 1271, 1276 (9th Cir. 2003) ("[A]ctual influence on an agency action is not an element of the crime"). But the jury had no idea how federal prosecutors litigate cases and what factors influence their decisions to call one witness and not another, particularly in gang cases in which any witness with inside knowledge of a gang is unlikely to have an untarnished record. The government's additional

---

[5] The Court instructed the jury to disregard a portion of the prosecutor's closing argument in which she asserted: "you heard evidence that they talked about what criminal charges he would have to plead to in order to become a witness. This is all proof that this was a material fact . . . ." See RT 39. The Court explained that the argument called for speculation and that "[t]he Government has, from time to time, used all sorts of people as witnesses." Id. Of course, regardless of what the prosecutor argued, argument is not evidence.

11

arguments, that it could not put on evidence that Acosta was not going to testify in the MS-13 trial because that trial was still ongoing, and that the Court barred it from putting on evidence that Acosta had not yet testified in the MS-13 trial, see Opp'n at 15, also miss the point. The government could have called a federal prosecutor to testify that Acosta's false statement <u>was capable of</u> influencing his or her decision of whether to have him testify. It did not do so.

Most important, even if there had been evidence of the false statement's materiality to federal prosecutors – or if, as the government suggests, it would be permissible for the jury to find materiality in the absence of such evidence, based on how they imagine federal prosecutors must think – the jury was never instructed on the federal prosecutor theory of materiality. See Jury Instructions (dkt. 39) at 14-15 ("[T]he statement was material to the activities or decisions of Immigration and Custom Enforcement.").[6] Notably, this instruction was not a result of some sleight of hand by defense counsel; the instruction was <u>provided by the government</u>. Compare <u>id.</u>, with Gov. Proposed Instructions (dkt. 24) No. 34 ("[T]he statement was material to the activities or decisions of Immigration and Custom Enforcement."). A defendant can only be convicted based on a theory on which a jury is instructed. See McCormick v. United States, 500 U.S. 257, 270 n.8 (1991) ("This Court has never held that the right to a jury trial is satisfied when an appellate court retries a case on appeal under different instructions and on a different theory than was ever presented to the jury. Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.").

Accordingly, the Court concludes that the government failed to prove Acosta's guilt as to the federal prosecutor theory of materiality.

//

//

---

[6] The Court rejects the argument made by government counsel at the motion hearing that the instruction referencing only the ICE theory of materiality "was sufficient to encompass all of the decisions that had to be made by the prosecution." See Tr. (12/14/11) 16. Agent Moore's testimony was that he did not make such prosecutorial decisions. See RT 140 ("That's not my job, to decide any of those – those – [issues about whether Acosta would testify].") .

12

### C. The ICE Theory of Materiality

The next argument Acosta makes in his motion is that the evidence was not sufficient to support a conviction on the theory that his false statement was material to ICE. See Mot. at 16-17.[7] Again, the Court agrees, for the purposes of the Rule 33 motion only.

"A false statement's capacity to influence [the agency] must be measured at the point in time that the statement was uttered." United States v. Sarihifard, 155 F.3d 301, 307 (4th Cir. 1998). Acosta's false statement therefore must have been material to ICE's decision to use him as an informant as of the time it was uttered: December 2008. But by December 2008, Acosta had already been an informant for ICE for three years, and the undercover part of his work was over. See RT 173 (Q: "When you learned about the bus-driver incident [in December 2008], and potentially him being part of three murders, you still used him? You still used him as an informant, right?" A: "Well, he was – we were past that phase, but we continued to move to trial as if he would be a witness; a testifying witness for us. Yeah.").[8] Thus, Acosta's false statement must have had the capacity to influence ICE's decision to continue to use him – not as an undercover informant, but to help the government make sense of the information he had previously gathered as an undercover informant.

---

[7] Acosta argues that the ICE theory of materiality was not charged in the indictment, see id. at 13, and therefore refers to that theory as an "uncharged theory," id. at 16; Reply at 4. He reasons that because, in December 2008 his "work as an informant was over, and he was under the control of federal prosecutors," the indictment could only have "alleged that his charged statements were material to the decisions of those prosecutors." Mot. at 13. The Court disagrees: the indictment broadly alleged that the false statement was told both to federal prosecutors and to ICE. See id. at 7. Accordingly, in the Court's view, the indictment contained two theories of materiality, and the government narrowed its case by only instructing the jury on one of those theories. See Opp'n at 18 ("At most, therefore, the jury instructions narrowed the theory presented to the jury by failing to mention 'federal prosecutors.'"). The Court therefore rejects Acosta's argument, see Mot. at 17-18, that the evidence at trial constructively amended the indictment. See United States v. Miller, 471 U.S. 130, 138 (1985) (holding that there is not a constructive amendment of an indictment where the jury considers a theory that narrowed the indictment's charges).

[8] But see RT 85 (Moore testimony that between June 2008 and December 2008, Acosta was still "very active" in "generating a lot of incredibly good information from the streets"). For the purposes of the Rule 29 motion, in which the Court must view all the evidence in the light most favorable to the prosecution, see Jackson, 443 U.S. at 324, the Court will accept that Acosta continued to act as an undercover informant in December 2008; for the purposes of the Rule 33 motion, however, the Court concludes that the far more reasonable interpretation of the testimony was that by December 2008, two months after 40 members of MS-13 were arrested based, in part, on Acosta's information, see RT 23, 55, 69, 131, Acosta's undercover work was complete.

13

But the evidence that came in at trial overwhelmingly related to ICE's decision to use Acosta as an undercover informant in the first place, not its decision to continue to work with him in December 2008. For example, Agent Merendino testified, in the context of discussing the decision of whether to use Acosta as an informant initially, that "[i]f he had an extensive criminal history in either the U.S. or in his country of origin, we would likely opt to not utilize him as a source, due to the liability concerns." RT 19-21. Agent Merendino further testified:

> Q: And how would it have made a difference in whether or not he could act as an informant for ICE?
> A: He definitely would not have acted as an informant for ICE if we had knowledge that he committed eight homicides.
> Q: What would be the concern?
> A: General liability concern of . . . for the Government and the public safety here in the United States.

Id. 57-58. That Agent Merendino referenced public safety underscores that he was talking about using Acosta as an undercover informant, on the street, where he could be a danger to the public, and not the work he was doing in December 2008, sitting in a government office reviewing audio files. Similarly Agent Moore testified that accurate information about an informant's criminal history is "important, if you have him working out on the streets with dangerous individuals, possibly around guns, knives, that kind of thing." Id. 81. Again, that is the work of an undercover informant, Acosta's previous role, not the work of someone reviewing files, Acosta's role in December 2008.

There is no evidence in the record that specifically supports the theory that the government would not have continued to use Acosta in December 2008 to help them process the "hundreds of hours of body-wire recordings" that he had made. See id. 69. Instead, there is evidence that Agent Moore remained Acosta's "controlling agent" through February 2011, and continued to work with Acosta to determine the content of the recordings that he made, and to prepare for trial. See id. 71, 69. And there are general statements by Agent Moore that the revelations of Acosta's criminal history "significantly damaged" the MS-13

14

investigation, see id. 168-69,[9] and that such revelations were "extremely important, significant events that [Moore] felt changed a lot of things about the investigation, and where this investigation would go." Id. 113. Such evidence – that ICE was still working with Acosta and that the truth of his criminal history had a negative impact generally on the MS-13 investigation – is probably sufficient under Rule 29 to support the theory that Acosta's false statement was capable of affecting ICE's decision to continue working to Acosta as of December 2008. See Jackson, 443 U.S. at 324 (Court must view all the evidence in the light most favorable to the prosecution).

Under Rule 33, the Court reaches a different conclusion. Under that Rule, "[t]he court is not obligated to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses." Kellington, 217 F.3d at 1097. Weighing the evidence, the Court finds it absolutely implausible that, having spent years gathering "incredibly good information" from Acosta about MS-13, RT 85, the government would have declined to avail itself of Acosta's help to make sense of that information. Although the Court could be convinced that the revelation of Acosta's true criminal history would have prompted the government to pull him from undercover work, see id. 81 (accurate information about an informant's criminal history is "important, if you have him working out on the streets with dangerous individuals, possibly around guns, knives, that kind of thing"), the Court cannot believe that the revelation was capable of prompting the government to pull Acosta from reviewing audio files in an office. As of December 2008, the government already knew that Acosta had a violent, criminal past that included kidnapping, attempted murder, carrying a homemade gun, searching for rival gang members while possessing guns, robbing, stealing, and smuggling grenades, id. 75-80, as well as the incident in which he passed along orders to have three bus drivers murdered. id. 88. The argument that the government made at the motion hearing, that the additional information changed the government's view of Acosta so dramatically that it would have opted not to use

---

[9] But see id. 169 ("There's not really an active criminal investigation. It's a trial-prep process.").

15

Acosta to process the information he had already gathered, see Tr. (12/14/11) 20 ("I don't think it's at all a stretch for the government to say that would have [a]ffected not only our decision to make him an informant . . . but . . . that we would have just given up on the information that he gathered"), therefore rings hollow. The evidence simply does not support such a theory.

The Court's conclusion that the evidence of materiality as to ICE is insufficient is further bolstered by the prosecutor's closing argument, which, like the evidence, focused overwhelmingly on ICE's decision to use Acosta as an informant in the first place. The federal prosecutor argued: "And, because Acosta lied about his past, because he didn't disclose those murders, he became an informant for ICE." RT (7/12/11) 14 (emphasis added). She argued, "[A]s an informant, he was allowed to stay in the country. He was given work authorization. He was paid money. And later on, his family members were moved to the United States for their safety. These were all benefits that the defendant received because he lied. . . . he would not have received those benefits if he had not been approved to work as an informant." Id. (emphasis added). At the conclusion of her closing she also referenced "whether he would even have been put in the position of being an informant for the Government," id. 26; but see id. 9, 26 (generalized arguments that the false statement was capable of affecting how agents and prosecutors would "do their work"). Despite government counsel's characterization at the motion hearing,[10] the prosecutor in Acosta's trial never once mentioned in her closing that the December 2008 false statement was even relevant to ICE's decision to continue working with Acosta to review the information he had already gathered.

Accordingly, the Court finds that, although the generalized testimony about working with Acosta as an informant is sufficient for the purposes of the Rule 29 motion, the evidence as to the ICE theory of materiality "preponderates sufficiently heavily against the verdict that

---

[10] See Tr. (12/14/11) 24-25 ("Part of being an informant is going through the tapes, translating things, whatever he needed to do in order to prepare for trial, and that would not have occurred, I think, is consistent with Ms. Wong's argument, that would not have occurred if he had told the truth in December 2008.").

16

a serious miscarriage of justice may have occurred," see Kellington, 217 F.3d at 1097, and so the Court will set aside the verdict and grant a new trial under Rule 33.

### D. The Jury Might Have Convicted on an Uncharged False Statement

The final argument Acosta makes in his motion is that the jury might have convicted him on an uncharged false statement, requiring a new trial under Rule 33. See Mot. at 19-21. The Court again agrees.

The indictment charged Acosta with a single material falsehood in December 2008. See Indictment. The jurors therefore had to agree that Acosta told a material falsehood in December 2008. At trial, however, the government also introduced evidence that Acosta denied having committed any murders in May 2008. RT (7/11/11) 80 (testimony about May 2008 false statement); id. 81 (testimony in the context of the May 2008 false statement that accurate information about an informant's criminal history is "important"). Although the May 2008 false statement was relevant background to the charged conduct, it also created a risk that Acosta would be convicted on a statement other than the one he made in December 2008.

That risk was compounded by the government's closing arguments, which referenced multiple false statements.[11] Thus, although the prosecutor began her closing argument by talking about the December 2008 false statement, see RT (7/12/11) 9 ("That is what the defendant . . . told [the government] in December of 2008"); id. 10 ("charged with making a material false statement to law-enforcement officers in December 2008"), the prosecutor also argued, "The problem that the defendant faced in telling these lies is he had to tell it over and over and over. He had to tell it to different people. He had to tell it in different contexts at different times. . . . And you heard from Special Agent Moore that the defendant lied repeatedly." Id. 14-15. She argued, "it became clear in February of this year that the defendant lied in May 2008; that he lied in December 2008 about whether or not he personally killed anyone." Id. 18. And she argued: "he lied in May 2008 . . . he lied on

---

[11] Even the government's opening argument used the plural, stating: "This is a case about lies." RT (7/11/11) at 3.

17

December 2008." Id. 24. Although the prosecutor stated again in her rebuttal argument that "[t]he question is whether he made a false statement in December 2008," id. 38, in the same rebuttal argument she argued, "in May – at the very least, in May 2008, . . . the prosecutor at that time, asked the defendant directly, 'Have you ever killed anyone?' And he said, 'No,'" id. 36. The Court has no confidence, therefore, that the jury was left with the understanding that it could convict Acosta only of the December 2008 false statement.

The risk that Acosta would be convicted on a statement other than the one he made in December 2008 was further compounded by the jury instructions, which did not specify the date of the charged false statement. See Jury Instructions at 14-15 (instruction on false statement). Although the jury instructions contained a general unanimity instruction, see id. at 16 ("[y]our verdict, whether guilty or not guilty, must be unanimous"), the jury was never instructed that all of the jurors had to agree to the same statement in December 2008. The jurors might have believed that they reached unanimity by some of them finding that Acosta had lied in May 2008 and some of them finding that he had lied in December 2008. That is impermissible. See United States v. Lyons, 472 F.3d 1055, 1068 (9th Cir. 2007) (quoting United States v. Kim, 472 F.3d 1055, 1068 (9th Cir. 1999) (specific unanimity instruction required if there is "'genuine possibility of jury confusion or that a conviction may occur as the result of different jurors concluding that the defendant committed different acts'").

Because the Court has no confidence that the jury convicted Acosta only on the charged December 2008 false statement, Acosta is entitled to a new trial.

**IV. CONCLUSION**

For the foregoing reasons, the Court DENIES the Motion for Acquittal but GRANTS the Motion for a New Trial.

**IT IS SO ORDERED.**

Dated: January 30, 2012

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE